| | | |
|---|---|---|
| United States District Court | | Southern District of Texas |

| | | |
|---|---|---|
| Randall L. Little, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | Civil Action H-07-871 |
| Shell Exploration & Production Company, *et al.*, | § § § § | |
| Defendants. | § § | |

# Opinion on Summary Judgment

1. *Introduction.*

    As part of their job, two government accountants audited an oil company. They reported that its royalty payments should have been calculated in a way that would have resulted in additional revenue to the United States.

    They reported their findings to their supervisors. In its judgment, the agency decided that the components of the company's calculation were consistent with the mineral leases. The auditors disagreed. They sued under a statute authorizing suits under the theory of *qui tam*; that law encourages private suits to recover governmental losses. The private plaintiff sues in his name for the benefit of the United States, and if he wins he shares in the recovery.

    Because they are not the original source of the information, government workers have no standing to sue as individuals when they have been paid to find and report the accounting questions that they now describe as a fraud. The auditors have no claim.

2. *Background.*

    Randall Little and Joel Arnold are senior auditors for the Minerals Management Service of the Department of the Interior. They are paid by the national government to find and report accounting irregularities, including fraud.

For the government, they audited the payment of royalties by Shell Exploration & Production Company and its subsidiaries. Little and Arnold were directly assigned to that project. They concluded that Shell underpaid royalties to the government by deducting transportation costs from six deep-water wells on federal leases in the Gulf of Mexico.

3.  *Qui Tam.*

*Qui tam* is an abbreviation of the Latin phrase *qui tam pro domino rege quam pro se ipso in hoc parte sequitur* meaning "he who sues for the king as well as himself." Congress allows these actions to encourage people to bring fraud to the attention of the government.[1] The law has an incentive – successful plaintiffs keep up to 30 percent of the government's recovery.[2]

4.  *Conflict of Interest.*

Little and Arnold are government employees. The government, though abstractly omnipresent, acts through people, and it must find fraud through its agents investigating for it. The people of America paid Little and Arnold to audit Shell. They discovered the claimed deductions in the course of their job – the essence of their job. They did it on government instruction, on government time, and on taxpayer's money. They are now converting governmental – public – information that they were paid to collect to their individual benefit.

Besides the misappropriation of government-paid work to themselves, these lower-level, technical staff are converting a policy decision by their superiors into a personal claim. The government struggles enough in the execution of its policy without over-ruled employees second-guessing it at each step with a lawsuit. Little's and Arnold's jobs gave them important authority – authority to research and report. They are not authorized to decide or to reverse decisions of others choosing the agency's policy on the data they compile and analyze.

Agencies within the government may not use the courts as a forum for litigating with each other their competing interests within the government. We have a president to resolve internal disagreements among the components of his branch. A government where the Environmental Protection Agency could sue the Federal Trade Commission for not prosecuting

---

[1] H.R. Rep. 660, 99th Cong., 2d Sess. 23 (1986); S. Rep. 345, 99th Cong., 2d Sess. 23-24 (1986); U.S.C.C.A.N. 5266, 5288-5289 (1986).

[2] 31 U.S.C. § 3730(d)(2) (2010).

a company whose products might be toxic would collapse into a mass of legal wrangling among mandarins.

Additionally, governmental employees' use of governmental time and property for personal gain is restricted.[3] Federal employees may not use nonpublic governmental information to further private interests.[4] They may not work as employees on projects in which they have a financial stake.[5]

Little and Arnold are not the people whom Congress intended to encourage to bring *qui tam* suits. Allowing them to sue would give all government auditors a personal financial incentive to find "fraud" in their work, especially fraud that their bosses would reject, giving them a claim. This would create a perverse incentive. It would add a profit-motive to ordinary administrative disputes and encourage exaggerated claims. This motive may sway them to withhold information from superiors and save it to build a case. The law compels this result categorically from the nature of the relationship. Elsewhere, the law speaks in detail about conflicts of interest and duty.

5.  *Agency.*

Allowing a government agent to sue in his private capacity on government business conflicts with his duty to his principal. Generally, knowledge of an agent is imputed to the principal if it was discovered on duty.[6] Little and Arnold are not capable of independently

---

[3] "Nonpublic information" is "information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the public." 5 C.F.R. §§ 2635.101(b)(7), 2635.702, 2635.703(b) (2010).

[4] §§ 2635.101(b)(3), 2635.703(a).

[5] §§ 2635.402, 501-502, 403.

[6] *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 300 (Tex. 1981) (notice to a bookkeeper of payment policy where he was authorized to disburse was notice of the policy to the principal); "The clearest case for the application of the rule of imputed knowledge is where the agent has a duty to reveal the information he has received." W. Edward Sell, *Sell on Agency* 77 (1975); "[T]he knowledge which a person has, either by himself or through his agent, actual knowledge; or if it is necessary to make a distinction . . . the latter might be called imputed knowledge." *Espin v. Pemberton*, 44 E.R. 1380 (Court of Chancery 1859).

bringing fraud to the attention of the government – they are the government.[7] There is simply no distinction between a government auditor's discovering fraud and the government's discovering it. Little and Arnold are not capable of auditing Shell without the mantle of the national government.

An agent may not act for his own benefit unless he has the consent of the principal – when the principal has full knowledge of the facts.[8] An agent has no consent when he has sued his principal's contracting partner and, having been offered the claim, his principal has declined to assume the suit.

A government employee is paid wages by the people of the United States for his work-time pursuing the fraud. He is paid to disclose his work to the government. Then, he uses his work to share in the United States' recovery on the very same fraud. This double-compensation is itself a fraud against the principal – the people of the United States. Little and Arnold, as agents of the government, may not "profit from information already obtained at the taxpayer's expense."[9]

Occasionally a government worker who is not directly responsible for a matter will collaterally discover an irregularity. If it is not pursued by her superiors, she might conceivably be allowed to bring a claim in which she could share, but that is not this case.

6. *Text.*

In a section titled "Actions by Private Persons," the Federal Claims Act says that a "*person* may bring a civil action for a violation . . . for the person and for the United States Government."[10] Neither Little nor Arnold is that person.

In a similar case, a government employee was held to be a person under the statute – after citing four dictionaries that defined a person alternatively as a "human being" and as an

---

[7] Quoting Chitty, "In point of law . . . principal and agent, are considered as one and the same person." Oliver Wendell Holmes, Jr., *The Common Law and Other Writings* 83 (1982).

[8] *Allison v. Harrison*, 156 S.W.2d 137, 140 (Tex. 1941) (agents sold one-half of a royalty for their account while telling the principal that it had all been sold to the state).

[9] *United States ex rel. LeBlanc v. Raytheon*, 729 F. Supp. 170, 176 (D. Mass. 1990).

[10] 31 U.S.C. § 3730(b)(1) (emphasis added).

"individual." It concluded that "there can be no doubt that it unambiguously encompasses all individual human beings . . . ."[11] Apart from the purile reasoning, this conclusion ignores the context. If the question were simply whether a plaintiff who sues under a *qui tam* statute is a human being, the proper test is a medical one. The statute is making a distinction among persons. The law, like life, is nuanced.

The title of this section is "Actions by Private Persons." Private is an adjective. It qualifies and limits persons. Congress could have titled the section "Actions by Persons" or "Actions by *homo sapiens*." It did not. Congress acknowledged the different types of persons, and it applied this section only to some of them.

Although Little and Arnold are persons, as agents of the government, they are not private persons eligible to sue under the statute on topics within their responsibilities.

7.  *Whistle-blowers.*

Little and Arnold have blown no whistle.[12] They reported their conclusions to their superiors all within the essence of their direct responsibilities. They also have only suggested that their bosses are complicit in the oil company's misdeeds in the disallowed amended complaints. They merely went through channels and sued. They have no risk of retaliation should they report fraud; they are routinely well paid to do it.

Even so, an analogy from a whistle-blower may help here. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." In that case, a deputy district attorney had objected to an affidavit used to secure a search warrant and recommended that the case be dismissed. His supervisors disagreed. The lawyer said that he was transferred to a different section because of that disagreement, and he sued his supervisors for retaliation. The attorney's speech was unprotected by the Constitution because he was not acting as a citizen while he was doing his

---

[11]*United States ex rel. Holmes v. Consumer Ins. Group*, 318 F.3d 1199, 1208-09, (10th Cir. 2003) (en banc).

[12]5 U.S.C. § 1213 (2011).

job. Instead, he was serving for pay as a worker who was paid to perform assigned duties. [13] The junior prosecutor was paid to discuss problems with warrants, but he was also paid to have his opinions overruled. Absent illegality – when he has an affirmative duty to not comply – he may not elevate a bureaucratic dispute into a statutory right much less a Constitutional one.

This distinction is even more potent here. If a government employee is not constitutionally *protected* for work-related speech about perceived internal misconduct, he may not *sue* on it for himself after his employer has decided that it is not worth pursuing.

8. *False Claim.*

When the facts of Little's and Arnold's claim are shorn of the abstraction and exaggeration, the story is their re-interpretation of a contract clause – not cheating, not fraud, not a false claim. They predicated their re-interpretation on news stories and parallel claims in slightly different situations. Shell hid nothing, altered nothing. As it appeared to the auditors, the records were complete and accurate, but they reported to their superiors that, if the government changed the terms of the arrangement with Shell, it could claim additional money.

The law requires a knowing misstatement for the purpose of getting unsupported money from the government. The auditors "discovered" and volunteered a dispute about the terms of the operations, labeled it fraud, and sought personal gain from their misbegotten offspring.

Little attempted to manufacture a claim by violating his rules and issuing arbitrary orders.[14] The deduction of transportation costs is not fraudulent unless it is both not authorized by the contract and hidden.[15]

---

[13] *Garcetti v. Ceballos,* 547 U.S. 410, 421-22 (2006).

[14] ". . . premised on a lack of knowledge of other MMS efforts to collect royalties and interest or the relators' . . . fundamental disagreement with MMS management decisions and MMS guidance that the oil companies were following . . . we found that the relators failed to follow either MMS or Departmental reporting requirements." Earl E. Devaney, Dept. of Interior, *Minerals Management Service: False Claims Allegations* cover letter (2007).

[15] "Accordingly, the Supervisory Auditor said he believed Little had neither the authority nor the necessary information to deny Shell's deductions . . . Little's email to Shell basically skipped the data request – and the subsequent review of data – and jumped straight to a

9. *Job Duties.*

Even if government employees are not categorically excluded from suing under *qui tam*, Little and Arnold are still barred because they were hired specifically to uncover fraud. Little's and Arnold's hired investigation into particular type of accounting record, where they say that they discovered fraud, is so closely aligned with the basis of their *qui tam* action that there is no distinction between the two.[16] This is a direct, rather than an incidental, conflict of interest. The fruits of their investigation belong to the government, not to them.[17] If the government does not agree with their analysis or does not want the money, it is beyond the auditors' competence; that choice belongs to others.

Sometimes an employee is unable to generate serious interest in apparent fraud through typical channels. The lack of interest is not necessarily a venal screen nor does it improve the substance of the facts of the report. After having been paid to check these records, Little's and Arnold's conclusions were considered and rejected. The government did not neglect or hide the auditors' questions; it made a policy decision that they were wrong.

10. *Specific Exclusions.*

Assuming Little and Arnold were proper parties to bring this suit, their claims against Shell would still collapse because, long before they discovered the issue, it had been in the public spotlight for years. A relator cannot sue "based upon the public disclosure of allegations or transactions" in hearings or by the news media unless he is an original source of the information.

---

preliminary request denying Shell's deductions." Devaney 74.

[16]Former auditor in the Department of Energy was barred because his action was based on work. *United States ex rel. Fine v. Advanced Sciences*, 879 F. Supp. 1092, 1095-96 (D.N.M. 1995), *aff'd*, 99 F.3d 1000 (10th Cir. 1996).

[17]"The agent, especially, can not use to his own advantage information or opportunities coming to him by reason of his employment; but must turn everything in connection with his employment to the advantage of his employer, if it can honestly and fairly be done." John C. Townes, *Studies in American Elementary Law* (2d ed. 1921).

A.  *Public Information.*

(1)  *Public Disclosure.*

A topic has been disclosed publicly when either the allegation of the fraud itself or its elements have been in:

- A criminal, civil, or administrative hearing;
- A congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation; or
- The news media.[18]

Shell has many examples in each category. In 2000, the Interior Board of Land Appeals reversed the Service's decision to deny Shell's transportation deductions to cover its capital costs. Shell has shown that the Service actually elicited comments to clarify the distinction between gathering and transporting oil so it could ascertain how properly to apply federal regulations to deep-water leases.

In 2004, Shell was sued in the Eastern District of Texas for taking wrongful deductions for natural gas produced on the outer continental shelf. Little and Arnold testified that they knew of suits about Marathon Oil's and Philips Petroleum's deduction of natural gas transportation costs. In 2005, Shell was sued for underpayment of the government through erroneous transportation deductions on carbon dioxide royalties from southwestern Colorado.[19] These claims were highly publicized as well as duplicated for private and governmental mineral owners. Shell has also submitted congressional press releases and articles that comment on the issue. All of these are public disclosures.

(2)  *Basis.*

For an action to be based on public disclosure, the disclosure and the factual basis of the suit need not be identical. Rather, the public disclosure must have been sufficient for the government to find related frauds, even though the circumstances of the transactions may differ.[20]

---

[18] 31 U.S.C. § 3730(e)(4)(A).

[19] *Bailey v. Shell Western E&P, Inc.*, 555 F. Supp. 2d 767 (S.D. Tex. 2008).

[20] *United States ex rel. Fed. Recovery Servs. v. Cerscent City E.M.S., Inc.*, 72 F.3d 447, 451 (5th Cir. 1995).

Little and Arnold say that Shell fraudulently deducted oil transportation costs on the Mineral Management Service's Form 2014s for specific oil leases from October 2001 through December 2005. The record shows that the earlier, notorious claims are parallel to the auditors' suit. Little and Arnold complain by merely applying public information – in both senses – to specific leases that they investigated for the government.

Little and Arnold admit as much in their response to Shell: "The cases listed by Shell identify wrongful acts committed by several petroleum companies, in different time periods, on different leases, and for different products." Changing 2005 to 2006, carbon dioxide to gas, on-shore to off-shore, tract A to tract B, and Shell for Exxon do not change the mechanism of the fraud or the obviousness that the question would potentially apply to every operator of a federal lease. Lower payment of royalties are identical from deducting transportation costs.

### B. Original Source.

When an action is based on a public disclosure, the person can still proceed if he is an original source of the information. Under the law, an original source is someone with antecedent, direct, and independent knowledge of the facts, who has volunteered the information to the government.[21]

Little and Arnold had direct knowledge. It was not independent to them or from the news stories. They cannot be original sources because they did not give America anything. They are incapable of volunteering information to the government that it paid them to gather for it. Whatever Little and Arnold produced, it is the property of the government. Little and Arnold were required to report to their superiors at the Service as part of their jobs as auditors.[22]

---

[21] § 3730(e)(4)(B).

[22] See, e.g., Wercinski v. Int'l Bus. Mach. Co., 982 F. Supp. 449, 461-62 (S.D. Tex. 1997) (Defense audit agency employees cannot voluntarily disclose overcharges to the government); United States ex rel. Leblanc v. Raytheon Co., Inc. , 913 F.2d 17, 19 (1st Cir. 1990) ("quality assurance specialist" for the defense agency is not an original source); United States ex rel. Fine v. Chevron, 72 F.3d 740, 743-44 (9th Cir. 1995) (retired auditor of the Inspector General at the Department of Energy cannot voluntarily disclose fraud); United States ex rel. Schwedt v. Planing Research Corp., Inc., 39 F. Supp. 2d 28, 26 (D.D.C. 1999) (director in the pension administration is not original source because his role obliged him to report it).

The auditors did not "volunteer" the information to television reporters before parallel news stories had circulated. Nothing that they did was original or spontaneous; it was derivative – tertiarily so.

11. *Conclusion.*

"Actions by Private Persons" excludes public persons. Little and Arnold as the government's agents are subsumed in it as their principal. While that is enough to conclude their claim, they did not originate the claim that they made. They did not donate it to the government.

Randall Little and Joel Arnold have been unable to describe factually a claim that is legally recognized. Their claims will be dismissed with prejudice.

Signed on April 8, 2011, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge